Argued April 28, affirmed May 11, former opinion modified
June 8, 1955

# SCHOOL DISTRICT No. 1, MULTNOMAH COUNTY
## ET AL. *v.* BINGHAM ET AL.

283 P. 2d 670
284 P. 2d 779

*Robert Y. Thornton,* Attorney General, Salem, and
*E. G. Foxley,* Deputy Attorney General, Salem, argued
the cause for appellants.

*Grant T. Anderson,* Portland, argued the cause for respondents.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, TOOZE and PERRY, Justices.

LATOURETTE, J.

This is a declaratory judgment proceeding brought by School District No. 1, Multnomah County, et al., against the members of the Tax Supervising and Conservation Commission of Multnomah County and the Attorney General, to obtain a judicial construction of Art XI, § 11 of the constitution which was amended November 4, 1952, the applicable part being:

"(1) Unless specifically authorized by a majority of the legal voters voting upon the question, no taxing unit, whether it be the state, any county, municipality, district or body to which the power to levy a tax shall have been delegated, shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than its tax base, as hereinafter defined. The tax base of each said taxing unit for any given year shall be: (a) The total amount of tax lawfully levied by it in any one of the three years immediately preceding for purposes other than the payment of bonded indebtedness or the interest thereon and exclusive of any levy specifically authorized as aforesaid in excess of the tax base, plus six percentum of said total amount; or, (b) an amount approved by a majority of the legal voters voting upon the question of establishing a tax base.

"(2) The question of establishing a tax base

shall be submitted at a regular general or primary election. Every such measure shall specify in dollars and cents the amount of the tax base in effect and the amount of the tax base sought to be established, and the new tax base, if adopted, shall first apply to the levy for the fiscal year next following its adoption."

On March 4, 1954, the board of directors of plaintiff district adopted a resolution calling for an election to increase the tax base from $7,419,476 to $12,704,644. On May 21, 1954, an election was duly held whereby the voters of plaintiff school district increased the tax base of the district to $12,704,644. On June 24, 1954, the school directors levied a tax for the fiscal year, July 1, 1954 to June 30, 1955, of $11,190,000.

On November 8, 1954, the directors of the district adopted a resolution indicating a need for a levy of $12,704,644 for the fiscal year 1955-1956 and called on the Tax Supervising and Conservation Commission of Multnomah County to declare its position in the premises. Thereupon the said commission by resolution declared its position to be that the district could not legally levy a tax in excess of $11,190,000 plus six per cent of said amount.

The trial court held that the district was constitutionally authorized to levy a tax for the fiscal year 1955-1956 in the amount of $12,704,644, the newly established tax base. Defendants appeal.

Defendants argue that notwithstanding the establishment of a tax base of $12,704,644 by the voters on May 21, 1954, since plaintiffs levied a tax of $11,190,-000 for the fiscal year 1954-1955, that establishes the tax base for the ensuing fiscal year and all that plaintiffs could levy would be that amount plus six per cent. They urge that subsection (2) of § 11, Art XI of the constitution must be read in connection with

subsection (1) of such section and article and is limited thereby. On the other hand, plaintiffs contend that subsection (1), § 11, Art XI of the constitution is not a limitation on subsection (2) and that when the voters establish a tax base such base remains until removed by the electorate.

■ It is a fundamental rule that when the language in a constitutional provision or statute is clear and free from ambiguity, it is not permissible to apply well-known canons of construction. This principle is clearly stated in *State ex rel. Bell v. Pierce,* 118 Or 533, 540, 247 P 812, as follows:

"The rule can be invoked only where the language of the constitution is doubtful, obscure or uncertain. If the language is plain and certain there is no reason for applying rules of construction. The wording of the amendment under consideration requires no construction. In an opinion by Mr. Justice Rand, Article XI-c was held by this court not to admit of construction.

" 'The language of the amendment is clear and free from ambiguity. By giving to the words used their usual and ordinary meaning, the intent of the amendment is plain, and nothing is left for construction.' Moore v. Olcott et al., 105 Or. 269, 209 Pac. 498."

Before proceeding to a consideration of the amendment we shall trace its history. As § 11 of Art XI originally appears in the 1916 amendment to the constitution, a tax levying body was limited in the amount of tax revenue that could be raised in any year to the total amount levied in the "year immediately preceding" plus six per cent. In 1932 § 11 was amended extending this limitation so as to allow a tax levying body to exercise its power of taxation in any year to raise an amount of revenue not in excess of the "total

amount * * * levied by it in any one of the three years immediately preceding'' plus six per cent.

Taxing bodies were authorized to levy special taxes in any one year providing legal voters gave their sanction. However, by the 1916 and 1932 constitutional provisions such special tax levy could not be included in the tax base for future levies.

By reason of constitutional limitations local governing bodies, on account of their growing financial needs, brought about by increased population, inflation and other economic factors, were hamstrung, so to speak, in raising sufficient revenue to meet the needs of government without resorting to annual special elections.

In order to obviate the necessity of holding special elections which added nothing to the tax base, Art XI, § 11, was amended to provide for two methods of determining a tax base. From the unambiguous language employed it is clear that the methods for determining a tax base are alternative and independent of each other. By subdivision (a) of subsection (1) of the amendment, it, like the previous constitutional provision, fixes the tax base at the amount of tax lawfully levied by a taxing unit to the highest levy during the preceding triennium plus six per cent. Subdivision (b) of subsection (1) authorizes a majority of the legal voters to establish a tax base. This the voters of the district did at an election in the amount of $12,704,644.

Subsection (2) of the amendment provides that the new tax base ''shall first apply to the levy for the fiscal year next following its adoption.'' The fact that plaintiffs levied a tax of $11,190,000 for the fiscal year next following the adoption of the new base of $12,-704,644 would not affect the tax base as established by the voters. There is nothing in the law requiring a taxing unit in levying taxes to utilize the full tax base

voted by the people. Such base becomes static until changed by the electorate. There is nothing in the language used that in any wise implies that the base established by the voters is later subject to the triennium levy plus six per cent found in subsection (1) of the amendment.

Defendants argue that subsections 3 and 4 of the amendment are indicative of the intent of the legislature to hold to the triennium principal plus six per cent, even though the people vote a tax base. Those subsections have to do with the levying of taxes when there has been a consolidation of municipal bodies, which we do not have in the present case.

■ Since the language of the amendment evinces a clear and unambiguous intent to authorize legal voters to establish a quiescent tax base, the decree of the learned trial judge will be affirmed.

No costs.

ON REHEARING

*Robert Y. Thornton,* Attorney General, Salem, and *Thomas B. Brand,* Deputy District Attorney, Portland, argued the cause for appellants.

*Grant T. Anderson*, Portland, argued the cause for respondents.

Alexander G. Brown, City Attorney, Portland, Marian C. Rushing, Chief Deputy City Attorney, Portland, Harry A. English, City Attorney, Bend, Dale E. Helikson, City Attorney, Oakridge, and Chris J. Kowitz, City Attorney, Salem, filed a brief amici curiae.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, TOOZE and PERRY, Justices.

LATOURETTE, J.

We granted a rehearing to the defendants who again urge that the plaintiff school district is restricted to the levy of $11,190,000 plus six per cent for the year 1954-1955 notwithstanding the voters of the district voted in 1954 a tax base of $12,704,644, and to the plaintiffs who ask a clarification of our opinion with respect to the application of the six per cent limitation to a voted tax base. On account of the public question involved, we have permitted a number of taxing bodies to file briefs amici curiae.

All parties agree that there is nothing in the constitution requiring a full utilization of the voted tax base in the fiscal year following the voted tax base. In other words, the taxing unit is permitted to levy a tax lower than the voted tax base in the fiscal year following the vote of the people.

■ Reverting to art XI, § 11 of the constitution, paraphrasing, we find that no taxing unit shall, in any year, levy a tax in excess of the tax base defined in the constitution. Two alternative methods are provided for arriving at a tax base: The automatic tax

base provided by the constitution itself which is the total amount of tax levied in any one of the three years immediately preceding, plus six per cent, or "an amount approved by a majority of the legal voters voting upon the question of establishing a tax base." When a measure is submitted to the voters to establish a tax base the constitutional provision provides:

> "* * * Every such measure shall specify in dollars and cents the amount of the tax base in effect and the amount of the tax base sought to be established, and the new tax base, if adopted, shall first apply to the levy for the fiscal year next following its adoption." Subsection (2), § 11, art. XI, Oregon Constitution.

From the above it is seen that when the voters establish a tax base in dollars and cents, which the voters in plaintiff district did in the amount of $12,-704,644, that remains the base until the taxing unit levies taxes in an amount equal to such tax base. There is nothing in the language that expressly or impliedly compels a taxing unit to immediately raise in taxes an amount equal to the full voted tax base.

Defendants' failure to distinguish between a voted tax base and a taxing unit's tax levy is in our opinion the basis for their erroneous construction of the constitutional provision. The people's voted tax base is not a tax levy but a yardstick governing a taxing unit in making a tax levy.

The language of the amendment, that the voted tax base "shall first apply to the levy for the fiscal year next following its adoption," clearly means that such voted tax base shall be the polar star on which the taxing unit must hitch its levy. In order to adopt defendants' view that the six per cent limitation is anchored to the tax levy rather than to the voted tax base, we would have to insert in subsection (1)

the following words, *the tax levy under,* before "the new tax base, if adopted, shall first apply," etc., which we are not permitted to do. ORS 174.010.

In their briefs, both original and on rehearing, defendants urge us to consider the arguments in the voters' pamphlet in connection with our interpretation of the constitutional provision. Were we to do so we would find the following language of the committee provided for by ch 546, Oregon Laws 1951, which does not support defendants' position: "If the new base is accepted by the voters, it automatically becomes subject to the six per cent limitation described above." The word "it" obviously refers to the voted tax base and not to the taxing unit's levy thereunder.

■ We now come to the question of whether or not subdivision (a) of subsection (1), § 11, art XI of the constitution relating to the six per cent limitation applies after the tax levy equals the voted tax base. In our original opinion we stated in no uncertain terms that it did not. On the original hearing before us briefs and arguments were not particularly directed to this question. However, we felt that the question was so entwined with the matter in issue that we should give consideration to the same. Upon the rehearing, however, the question was briefed and argued thoroughly. All parties to this litigation and the amici curiae agree that in any event the six per cent limitation does apply if the levy reaches the voted tax base. And in this we now concur.

■ Since, however, all the members of the court do not agree with us on this question, we shall state our reasons in support of our position. Everyone, so far as we can ascertain, connected with the promotion of the constitutional amendment, as is evidenced by the statements in the voters' pamphlet, and all litigants

in the present case, hold the view that the so-called six per cent limitation clause applies in any event on top of the voted tax base. Starting with this premise, it is our duty, if we can logically do so, to support that view. We are not unmindful, however, that if the language of the amendment is unambiguous, we must adhere to the language and not entertain anything dehors the same. We are of the opinion, however, that there is an ambiguity in the language used so far as the matter now being discussed is concerned.

 In construing the constitution the presumption and legal intendment are that every word, clause and sentence therein have been inserted for some useful purpose. The object and purpose of a constitutional amendment must be considered and it must not be interpreted on narrow technical principles but upon broad general lines in order that the object intended may be accomplished. *State v. Cochran,* 55 Or 157, 104 P 419, 105 P 884. We find in *Branch v. Albee,* 71 Or 188, 193, 142 P 598, the following language:

> "In construing a constitutional provision, the whole provision is to be examined with a view to ascertaining the meaning of every part. The presumption is that every clause has been inserted for some useful purpose, and therefore the instrument must be construed as a whole, in order that its intent and general purposes may be ascertained; and, as a necessary result of this rule, it follows that, wherever it is possible to do so, each provision must be construed so that it will harmonize with all others, without distorting the meaning of any of such provisions, to the end, that the intent of the framers of the provision may be ascertained and carried out, and effect be given to the instruments, as a whole."

Unquestionably, the legislature, in submitting the constitutional amendment to the people, had in mind that the voted tax base would be based upon the needs

of the taxing unit and that therefore the levy would equal the same. Keeping this in mind, the language used in subsection (2) of § 11 has significant importance. It is there stated that "the new tax base, if adopted, shall first apply to the levy for the fiscal year next following its adoption." Inasmuch as the taxing unit must submit to the voters the question of establishment of a tax base at a primary or general election, which would be in May or November, the next fiscal year, as a matter of law, would be July 1 following; so that the words, "shall first apply to the levy for the fiscal year next following its adoption" would be idle phraseology and surplusage if they were confined to the context of subsection (2) of the amendment.

Since we must presume that the words "shall first apply," etc., serve some useful purpose, we must look to the entire instrument, consider its history, the arguments by its proponents in the voters' pamphlet and its object and purpose, to ascertain the intent of its framers.

It could not logically be contended that the language meant that the voted tax base would first apply to the tax levy for the next following fiscal year and then, secondly, for the ensuing fiscal year because the tax base established by the voters would continue to apply indefinitely unless interrupted.

It is apparent to us that the language found in the amendment, i. e., the new tax base shall first apply, implies that another tax base shall thereafter apply. The only other tax base noted in the amendment is the six per cent limitation base and that, in our opinion, is the base intended. In this respect the words, "first apply," would serve a useful purpose which is in consonance with the intention of the framers of the amendment. We therefore are of the opinion that after

the tax levy reaches the tax base then the six per cent limitation found in subdivision (a) would apply and continue to apply until changed by a vote of the people.

Former opinion with the above exception is adhered to.

ROSSMAN, J., dissenting.

The prayer of the complaint follows:

"Plaintiffs pray that the court declare the rights, status and other legal relations of plaintiffs and defendants under Oregon Constitution, Article XI, Section 11, with respect to the amount of taxes which plaintiff district is empowered to levy for the fiscal year 1955-1956, and that it be declared and decreed that the tax base of plaintiff district for the fiscal year 1955-1956 and the amount of taxes which may be levied by and on behalf of plaintiff district for said fiscal year for the maintenance and operation of the district's school system without further authorization from the electorate of said district is the sum of $12,704,644."

Oregon Constitution, Art. XI, § 11, and the tax base election which was held May 21, 1954, render valid, in my opinion, the contemplated levy of $12,704,644 for the fiscal year 1955-1956. That is my answer to the question submitted by the complaint and its prayer.

Although the single issue suggested by the above-quoted prayer inaugurated this lawsuit, it now develops, as often happens in the course of litigation, that the battle lines have spread out and new dissensions have appeared upon the field of action. In that way there entered this case the question as to whether a tax base established by a vote of the people, acting under the provisions of Oregon Constitution, Art. XI, § 11 (1) (b), is static in amount or whether it increases if it develops that a levy made under it, plus six per cent thereof, is greater in amount than the voter-established tax base.

This is a suit for declaratory relief, and, although the issue just stated is not submitted by the pleadings, it is our duty to resolve it. But in making answer we must bear in mind that Art. XI, § 11, is a part of Oregon's Constitution. Therefore, this suit does not call upon us to state the effect of a norm, transient in nature, like a statute or municipal ordinance, but of a constitutional provision. Legislative enactments may readily be repealed or amended, but constitutional provisions generally remain unaltered for long periods of time. They govern matters fundamental in character and are adopted only after the people have debated their merits in protracted discussion. Since constitutional provisions yield law basic in character, those who draft them select their words deliberately and bestow painstaking care upon the important task of writing the measure. The manner in which the provision under analysis was written, as I shall presently show, illustrates the truth of the statement just made. Therefore, in construing Art. XI, § 11, we must give heed not only to the fact that its meaning is important to the taxing units, but we must bear in mind that we are called upon to construe a provision of our Constitution. If we interpret it as though it is of transitory nature only, the precedent we today establish may cause constitutional law to suffer from our work.

The part of Art. XI, § 11, which governs the issue under analysis was adopted by the people in the general election which was held November 4, 1952, as an amendment to that provision of our Constitution. I indicated that the amendment was carefully drafted. Senate and House Journal, 1951, warrants the statement just made. According to the entries of the Journal, the measure was presented by a member of the House and two members of the Senate. The member of the House is an Oregon newspaper publisher whose

writings have been widely quoted; the two members of the Senate have served in the latter for several sessions and have often made valuable contributions to our tax laws. After the measure was introduced in the House, it was referred to that body's committee on taxation. The Journal indicates that the committee just mentioned recommended the passage of the bill, subject to some amendments which the committee proposed. The amendments were made and thereupon the committee's recommendation was adopted. After the measure made its way to the other house, it was referred to the Senate's committee on taxation. That committee sponsored several amendments, one of which rephrased the very part of the constitutional provision with which this suit is concerned. After the Senate had voted in favor of the amendments it then adopted the measure. Subsequently the House concurred in the Senate's action. Still later the bill was signed by the Speaker of the House and the President of the Senate. Accordingly, the statement is warranted that this measure was written with deliberation and care. The action which I have so far mentioned was taken in the early part of 1951. The measure was submitted to the people at the general election November 4, 1952. Thus, ample time elapsed between the drafting of the measure and its submission to the people so that all could study it.

Anyone who reads Oregon Constitution, Art. XI, § 11, will have no trouble in arriving at a conclusion upon the issue stated in the second paragraph of this opinion. The part of Art. XI, § 11, bearing upon the issue is clear and incapable of misunderstanding. I will demonstrate the statement just made by quoting the pertinent part of Art. XI, § 11. In order to focus attention upon the words which are controlling, I shall omit, in making my quotation, all words which are

irrelevant to the issue awaiting answer. Stripped of immaterial words, the part reads:

> "* * * no taxing unit * * * shall in any year so exercise that power as to raise a greater amount of revenue, * * * than its tax base as hereinafter defined. The tax base * * * shall be: * * * (b) an amount approved by a majority of the legal voters voting upon the question of establishing a tax base."

Thus, when a taxing unit submits to the voters the question as to how much its tax base shall be, it is the voters who determine the amount. They fix the maximum. The amount in favor of which they cast their ballots is the greatest amount of tax which the tax levying officials can require the taxpayers to pay. The language just quoted is incapable of misunderstanding. It is as clear as the meaning of statutes which we frequently encounter, and which run something like this: No judge shall ever impose a sentence greater than the limits herein fixed. If anyone entertains any doubt upon the subject, his doubts will be quickly dispelled when he observes that the words "an amount approved by a majority of the legal voters voting upon the question of establishing a tax base" are not followed or augmented by any phrase such as "plus six percentum of said total amount" which accompanies and forms a part of alternative (a). The conclusion is inescapable that when a taxing unit chooses alternative (b) it rejects alternative (a), including the phrase "plus six percentum of said total amount". I am satisfied that the meaning of Art. XI, § 11, is clear, unambiguous and self-evident. Doubt cannot be imported into it through attempts to infuse into it the contents of the voters' pamphlet of the issue of 1952. It is our duty to construe Art. XI, § 11, and not the voters' pamphlet.

Before going on, it may be well, in behalf of clarity, to return to the year 1916. In 1916 the people of Oregon, in response apparently to Chief Justice Marshall's axiom, "The power to tax is the power to destroy", adopted the original version of Art. XI, § 11. The essence of that early effort to reserve to the people control over the size of their taxes was this: the current levy plus six per cent thereof established the limit of the next levy, unless the people who lived in the taxing unit by ballot expressly authorized an additional levy. Such was the fiat of the people when they, in 1916, adopted Art. XI, § 11. In 1932 the people amended Art. XI, § 11, by providing that the next levy could be in the amount of the highest levy which had been made in the last triennium, plus six per cent thereof. Obviously, the purpose of the amendment was to enable the public officials to be economical without losing thereby an adequate tax base. In the provisions so far mentioned the term "tax base" did not appear, but in popular discussion of this unique constitutional provision the levy, which, together with six per cent thereof, marked the meridian of the next levy, was spoken of as the tax base. It will be noticed that the effective limitation upon the size of the next levy is not the six per cent clause, but the amount of the current levy. The latter is 94 per cent of the control which Art. XI, § 11, places upon succeeding levies. The six per cent feature is purely minor. Yet, since the terminology "plus six per centum of said total" lent itself readily to appellation purposes, Art. XI, § 11, became known as the six per cent provision. When one reads statements quoted from the voters' pamphlet which appear in the briefs and which speak of "six per cent limitation", it is well to bear in mind that the words just quoted refer to Art. XI, § 11, in its entirety; they employ the term "six per cent limita-

tion'' as synonymous with Art. XI, § 11. The articles themselves make that clear; one of them says: ''The amendment to the Oregon Constitution known as the six per cent limitation was passed in * * *.'' The reference could just as well have been to Art. XI, § 11, but the constitutional provision under analysis never was known by that cumbersome title. Common parlance, in using the appellation ''six per cent limitation'' did not refer only to the six per cent clause, but to the fact that Art. XI, § 11, subjected levies to the control of the people. The clause of Art. XI, § 11, which restricted the next levy to the amount of the current one (apart from a permissible six per cent increase) was the phase of Art. XI, § 11, which put the real bite upon the taxing unit. It was that feature which endeared Art. XI, § 11, to the tax-conscious voter. Accordingly, I repeat that sentences in the voters' pamphlet, such as ''This measure would permit a new tax base to be voted, after which the six per cent limitation would apply'', were intended to assure the voter that the protective provisions of popular Art. XI, § 11, would remain unimpaired if he voted for the amendment.

We come now to the amendment to Art. XI, § 11, which was made by popular vote November 4, 1952. Until the amendment was made, a tax base could be established in one way only. I have described that way. Under it the highest levy in the triennium, plus six per cent thereof, established the tax base for the next levy. We are told that recent rapid increase in population and inflated costs of performing governmental service rendered inadequate in many taxing units an annual increase in levies of only six per cent. Some taxing units, according to counsel, were compelled year by year to go to the voters and ask for special levies supplementary to those which were authorized by Art.

XI, § 11. Those were the conditions which prevailed when the amendment to Art. XI, § 11, was submitted to the voters November 4, 1952. The amendment afforded taxing units an alternative to the triennium method for establishing a tax base. Its essence was that the voters could disregard the existing tax base and vote a new one. The old method, which had been in use for 36 years, was retained when the 1952 amendment was made and was identified in amended Art. XI, § 11, as alternative (a). The amendment couched the new alternative in these words: "Or (b) an amount approved by a majority of the legal voters voting upon the question of establishing a tax base." Alternative (a) [the old method] concluded with these words: "plus six per centum of said total amount". Neither that clause nor any corresponding provision was employed in the writing of alternative (b). Thus, after the voters had cast their ballots in favor of the amendment which incorporated in Art. XI, § 11, alternative (b), all taxing units were afforded a choice between two methods of establishing a tax base. A unit could remain under the method which it had followed for 36 years and thereby have a tax base capable of expansion at the rate of six per cent annually, or it could ask the voters to establish for it a larger and "more realistic" [quoting one of the briefs] tax base. But alternative (b) made no provision for the tax base established under it to enlarge.

The method whereby taxing units were afforded alternative means of establishing tax bases is couched in Art. XI, § 11, in this form:

"* * * The tax base of each said taxing unit for any given year shall be: (a) The total amount of tax lawfully levied by it in any one of the three years immediately preceding for purposes other than the payment of bonded indebtedness or the interest thereon and exclusive of any levy specifi-

cally authorized as aforesaid in excess of the tax base, plus six percentum of said total amount; or, (b) an amount approved by a majority of the legal voters voting upon the question of establishing a tax base."

I repeat the statement previously made: neither the clause "plus six percentum of said total amount" or any variation thereof was included in alternative (b).

When the draftsmen of the amendment to Art. XI, § 11, wrote the amendment there lay before their eyes in plain view the clause, "plus six percentum of said total amount". It formed a part of alternative (a). Those words could not have escaped the attention of the amendment's draftsmen, for the latter appended alternative (b) immediately following the words "plus six per centum of said total amount". Hence, they must have had those words in mind. The inference is unavoidable that the draftsmen intentionally rejected the clause. Likewise, the taxation committees of both the House and the Senate, as well as both of the houses, concurred in the rejection of that clause. The rejection, obviously, is significant. Had the clause also been omitted from alternative (a), a tax base under that method [that is, the highest levy in the triennium] could not increase year by year; it would be static. Since the use of the clause was essential to enable the tax base created by the triennial method to expand, it is impossible to know how a voter-approved tax base, from which the clause "plus six percentum of said total amount" was intentionally omitted, can enlarge. Certainly this court cannot write into the amendment the provision which the draftsmen omitted and in behalf of which no voter has ever been afforded an opportunity to cast a ballot. The revision of constitutional provisions is not one of the duties which have been entrusted to this court by the Constitution.

It is argued, however, that a levy made under a voter-approved tax base can be included in the triennial tax base and that after it has been so included its amount expands six per cent annually under alternative (a). An irrefutable answer to that argument is the fact that (a) and (b) are alternatives. When one is chosen, the other is rejected. When a taxing unit selects the manner in which its tax base is to be established, it must select either alternative (a) or alternative (b). It cannot pick both nor can it take parts of both. It is like asking an individual whether he wishes coffee or tea. If he makes coffee his selection, he does not expect to receive a full cup of coffee plus some of the choicer ingredients of tea. When alternative (b) is selected—and bear in mind that the selection is made by the voters—Art. XI, § 11, declares that the taxing unit shall not in any subsequent year "raise a greater amount of revenue than its tax base"; that is, greater than the amount fixed by the voters. Of course, if the voters later rescind the action previously taken whereby they established the tax base, the levies previously made under it could be deemed levies of the kind to which alternative (a) is applicable. But that would be true only because the taxing unit had rescinded and was no longer restricted by the voter-established tax base.

It must be plain that Art. XI, § 11, is free from ambiguity. When the meaning of any writing is reasonably clear and certain, no court is at liberty to resort to the rules of construction. A court, confronted with a writing which is nonambiguous, must give to the paper its normal effect. An effort is made, however, in this case to find ambiguity in Art. XI, § 11, by resort to the articles which appeared in the voters' pamphlet. In fact, those who wish to construe Art. XI, § 11, appear to center their attention upon the voters'

pamphlet and wish to interpret it rather than bother themselves with the carefully chosen words of Art. XI, § 11. As we have seen, allusions in the voters' pamphlet to the "six per cent limitation" referred in the main to nothing more than the popular appellation of Art. XI, § 11. They assured the voters that if they cast their ballots for the proposed amendment, the protective features of Art. XI, § 11, which for 36 years had gratified the taxpayers, would remain in effect. It is our duty to construe Art. XI, § 11.

However, it is argued that Art. XI, § 11, was adopted so that taxing units which found it impossible to function within a tax base fixed by the highest levy of the triennium, plus six per cent thereof, would not have to ask the voters to grant them special levies. Art. XI, § 11, does not proclaim the purpose just mentioned. Those who urge us to rewrite Art. XI, § 11, however, vouch for that professed purpose. In passing, let us remind ourselves that even minor documents which govern small matters are protected by this court against corresponding attacks. In repelling such attacks, we cite in cases of that kind the Parol Evidence Rule and other rules which deem the writing as the sole source of its meaning. But let us nevertheless consider the argument just mentioned. From their springboard that Art. XI, § 11, was intended to obviate the necessity for special levies, those who advance the argument under consideration leap to the conclusion that a voter-established tax base expands six per cent annually. Let us see whether or not the supposition in which they engage supports the views which they proclaim. The school district's most recent levy was $11,-190,000. If we assume that the levy of $11,190,000, plus six per cent thereof, established the tax base for the next levy, then we have a tax base of $11,861,400, constituting the maximum levy which can be made for

the fiscal year 1955-1956. But official action taken by the directors of the school district makes it a matter of record that the school district's need for 1955-1956 is a levy of $12,704,644. Accordingly, the school district will be compelled to ask its voters for a special levy in the sum of about $850,000. Thus, the contention that a voter-approved tax base was intended to eliminate the need for special levies fails. The argument, if carried to its logical conclusion, would require us, not only to write into Art. XI, § 11, the clause which its draftsmen rejected, but also to substitute in the rejected clause 12 per cent for six per cent. By holding that a tax base established under alternative (b) may be prospective in its scope, the school district may levy a tax for 1955-1956 in the sum of $12,704,644 without going to the voters for a special levy.

A ruling that a voter-approved tax base cannot be prospective in nature, but must be limited to the amount of the next levy, would leave the school district in a crippled predicament. If the voters who reside in a taxing unit cannot adopt a tax base prospective in nature, then the election which gave the plaintiff school district a tax base of $12,704,644 was an unlawful one. If it was an unlawful one, that is, if Art. XI, § 11, does not authorize taxing units to hold elections for the purpose of adopting tax bases prospective in nature, then the levy of $11,190,000, which was made shortly after the voters had cast their ballots, was also unlawful. Clearly, that levy cannot be sustained by the previous tax base of the school district, for the amount of the latter was only $7,419,476. Alternative (a) of Art. XI, § 11, in making provision for the triennial method of fixing tax bases, says, "the total amount of tax lawfully levied * * *." Accordingly, we see that if the tax base established by the voters cannot be prospective in nature, the levy of $11,190,000, which

was the last that the district made, cannot under any circumstances affect the levy for 1955-1956. Therefore, the next levy which the school district can lawfully make will be only $7,419,476.

Since the above was written, one member of the court claims that he has found an ambiguity; he claims that it lurks in the word "apply" which appears in subsection 2 of Art. XI, § 11. It is apparent, however, that the word "apply" is used in subsection 2 in order to render certain the time when a voter-established tax base becomes effective. It is intimated that provision for that purpose was unnecessary in the constitutional provision. I do not concur in that view. Words which achieve clarity in meaning are not unnecessary. It is impossible to understand how an ambiguity in the word "apply" (assuming that one there exists) can have any bearing upon any issue submitted by the petition for a rehearing. Moreover, before we attribute to the authors of the amendment of Art. XI, § 11, a purpose to use the word "apply" as the means of rendering a voter-adopted tax subject to expansion, we must believe that the responsible men who wrote the amendment wished to achieve their purpose in a most novel, devious and bizarre manner. They could readily have added to alternative (b) a clause similar to that which forms a part of alternative (a), but if we think that they seized upon the word "apply" as the medium for accomplishing their purpose, we must hold that they preferred legerdemain to direct open dealing. Finally, if a provision of our Constitution can be revised by this court through the process of saying that the word "apply" is ambiguous, then constitutions, federal and state, which are lauded on Constitution Day as the palladiums of our liberties, are in reality nothing but jumbles of words.

For the foregoing reasons, I am convinced that Art.

XI, § 11, is free from ambiguity. Its meaning is clear and certain. A voter-established tax base does not expand at the rate of six per cent per annum. It may be prospective in nature. I believe that our original opinion was free from error. Such being its nature, we should not retreat from it, but affirm it.

LUSK, J., dissenting.

The provisions of Art. XI, § 11, of the Constitution of Oregon, which we are called upon to construe read as follows:

"(1) Unless specifically authorized by a majority of the legal voters voting upon the question, no taxing unit, whether it be the state, any county, municipality, district or body to which the power to levy a tax shall have been delegated, shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than its tax base, as hereinafter defined. The tax base of each said taxing unit for any given year shall be: (a) The total amount of tax lawfully levied by it in any one of the three years immediately preceding for purposes other than the payment of bonded indebtedness or the interest thereon and exclusive of any levy specifically authorized as aforesaid in excess of the tax base, plus six percentum of said total amount; or, (b) an amount approved by a majority of the legal voters voting upon the question of establishing a tax base.

"(2) The question of establishing a tax base shall be submitted at a regular general or primary election. Every such measure shall specify in dollars and cents the amount of the tax base in effect and the amount of the tax base sought to be established, and the new tax base, if adopted, shall first apply to the levy for the fiscal year next following its adoption."

Prior to November 4, 1952, Art. XI, § 11, contained the substance of the limitation now found in § 11 (1) (a)

above set forth. The language was different, but the effect of the present provision is the same as before the adoption of the amendment. The provision of § 11 (1) (b), however, is new. The proposed amendment was referred to the people by the Forty-sixth Legislative Assembly (Oregon Laws 1951, p. 1168) and was adopted at the general election on November 4, 1952. It is conceded on all sides that the reason for including in the amendment authority to the legal voters of a taxing unit to adopt a new tax base, as provided in § 11 (1) (b), was that the six percent limitation had proved to be too restrictive in a time of inflation and rapidly growing population. School districts and other taxing units found it impossible to raise enough revenue under that limitation to meet their financial requirements, and hence resort was repeatedly had to special elections at which specific authority was sought and obtained to levy a tax in excess of the highest levy of the preceding triennium plus six percent. Since, however, under the terms of former § 11 (as well as under the present section) a tax levy thus specifically authorized could not be used to augment the tax base, it was necessary, as expenses continued to mount, to repeat the process of special elections year after year. This proved to be an extremely expensive and unsatisfactory method of ordering the fiscal affairs of the various taxing units. Hence, the adoption of § 11 (1) (b).

For convenience I shall refer to the base defined in § 11 (1) (a) by its popular name, the six percent limitation, and to the base defined in § 11 (1) (b), as the new tax base.

The present case arises in this way: In 1954 School District No. 1, Multnomah County, Oregon, the respondent here, finding that its financial requirements could not be met by a levy made subject to the six per-

cent limitation, a measure was submitted to the electors, and approved by them, at the primary election held May 21, 1954, authorizing a new tax base of $12,704,644. Without this authorization the greatest amount of revenue which the School District could have raised under the six percent limitation was $7,419,476. In submitting the proposal to the voters the School Board was at pains to explain that a levy in the full amount of the new base was necessary to meet the financial requirements, not for the fiscal year 1954-55 next following the election, but for the fiscal year 1955-56, and that the levy for 1954-55 would not be in the amount of the new tax base but in the amount of $11,190,000. Such a levy was accordingly made a year ago. It was far in excess of the six percent limitation. At the same time it was more than a million and a half dollars less than the amount of the new tax base. The district now proposes to levy a tax for the fiscal year commencing July 1, 1955, in the full amount of its new tax base. It claims the right to do so because the people adopted that base pursuant to a provision of the Constitution, and it insists that it may, as long as that tax base remains undisturbed by another vote of the people, indefinitely levy, year after year, the amount thereof or any lesser amount. The Attorney General, on the other hand, appearing for the appellant, the Tax Supervising and Conservation Commission, contends that the authority of the district's school board is now controlled by the six percent limitation, and that, since $11,190,000 was the highest levy for any of the past three years, the district is forbidden to levy any greater amount than $11,190,000 plus six percent. As the proposed levy far exceeds that limitation, it is invalid under the Attorney General's contention.

Our former opinion proceeded upon the assumption that the constitutional provisions in question are plain

and unambiguous and admit of no construction and no resort to extrinsic aid for ascertainment of their meaning. Further consideration of the case, aided by additional briefs and ably presented oral arguments of all counsel engaged, demonstrates that this was a mistaken assumption. The words of the constitutional amendment are plain and understandable enough—the difficulty is in reading them correctly in their context. Speaking of what he terms "enacted law", Judge Learned Hand says: "The duty of ascertaining its meaning is difficult at best, and one certain way of missing it is by reading it literally, for words are such temperamental beings that the surest way to lose their essence is to take them at their face." Hand, The Spirit of Liberty, p. 157. In the present instance, when it becomes necessary to apply the words—not just some of them but all of them—to the situation created by the action of the School Board in 1954, to take the words at their face is, in my opinion, to lead to error.

It is, of course, possible to say, as we said formerly, that the six percent limitation and the new tax base are separate and distinct things, that the taxing power is subject in "any given year" to either one or the other, and not to both, and, therefore, that a new tax base having once been adopted, the six percent limitation no longer has any function to perform so far as the particular taxing unit is concerned. But the contention of the School District, first pressed upon us in its brief in support of its petition for a rehearing, that it is authorized under the six percent limitation to add six percent to $12,704,644 in its levy of some future year brings into sharp focus the question of the correctness of that view.

That contention is based upon the fact that the six percent limitation permits the addition of six percent to the amount of the highest *levy* in any of the three

years immediately preceding. It is so stated in the School District's brief in support of its petition for rehearing, from which I quote:

"* * * A tax base *for any given year* is stated to be (a) the highest triennium levy plus six per cent or (b) an amount approved by the voters voting upon the question of establishing a tax base. Accordingly, the levy in any year of a base determined under clause (b) does not exclude subsequent application of clause (a) to such levy if that particular levy was the highest during the preceding triennium, for, regardless of the source of authority for the levy, it is nevertheless an 'amount of tax lawfully levied * * * in any one of the three years immediately preceding' and under the plain language of clause (a) that amount plus six per cent thereof is a tax base which may be lawfully levied in the year in question."

Thus, the School District would apply the six percent limitation—take the benefits of it, so to speak— in addition to levying the full amount of its new tax base. It says that it is authorized to go on indefinitely levying taxes *within* its new tax base, without incurring the hazard of the six percent limitation because then the new tax base is in control. That is the very question at issue in this case. It is only when the levy equals the amount of the new tax base that, according to the School District's contention, the six percent limitation comes into operation. In other words, the prohibition of the six percent limitation does not apply to the School District to its disadvantage, but may be used by it to its advantage.

Whether right or wrong, the argument brings into view the existence of an ambiguity in Art. XI, § 11, for it is nowhere expressly stated in those provisions that the six percent limitation has anything to do with a levy made pursuant to a new tax base. Yet the six percent limitation does prohibit the raising of any

greater amount in any given year than the highest levy of the triennium plus six percent; and a levy, *though* made pursuant to a new tax base, is nevertheless, indubitably a levy. We have in this case a proposed levy in an amount far in excess of the highest levy of the last triennium plus six percent. It is also in an amount not in excess of the new tax base. In that situation, which limitation is to control, the six percent limitation or the amount of the new tax base? Article XI, § 11, offers no certain answer to that question. Plausible arguments can be made in support of either view. The court is required to construe the language of the amendment, and is clearly entitled to seek aid from legitimate extrinsic sources in order to determine the people's *intention*—the ultimate object of its quest.

For light on the question we naturally and properly turn to the explanations of the measure found in the Voters' Pamphlet. *Eugene School District v. Fisk*, 159 Or 245, 256-257, 79 P2d 262. Both sides have quoted freely from these statements in their briefs on rehearing, and I shall do the same here. As a part of the joint resolution submitting the proposed constitutional amendment to the people, a committee consisting of one senator and two representatives was provided for and charged with the duty of preparing an argument in support of the amendment to be published in the Voters' Pamphlet. This duty was carried out. Another of the statements was prepared by a committee of three citizens designated pursuant to Oregon Laws 1951, ch 546, (ORS 254.210, 254.220), which provides for appointment by the Governor of two members of such a committee, one to be from among the proponents, if any, of the particular measure, and the other from the opponents if any, the two thus appointed to select the third member. The

function of this committee, as stated in the statute, was to prepare and file "as a public document with the Secretary of State, an impartial, simple and understandable statement explaining the measure and its effect." I quote from this committee's statement:

"The proposed amendment does not authorize any tax increase. It would enable any taxing body so desiring, to submit to its electorate in any primary or general election, a ballot measure authorizing the taxing body to adopt *a new tax base geared to its current costs of operation.* Such a proposal appearing on the ballot must contain in dollars and cents the amount of the requested tax base. If the new base is accepted by the voters, *it automatically becomes subject to the 6% limitation* described above.

"THIS AMENDMENT DOES NOT DO AWAY WITH THE 6% LIMITATION." (Italics added.)

In the argument prepared by the legislative committee appear the following statements:

"The amendment to the Oregon Constitution known as the six percent limitation was passed in 1914 in an effort by taxpayers *to prevent the growth of property taxes at a rate of more than six percent per year.*

"It is still a popular part of the constitution. It affects all taxing units.

"Changes in the state, growing communities, more school expense have rendered it ineffective in many cases. The amendment herewith proposed has been written *to preserve and again make workable and effective the six percent limitation.*
\* \* \* \* \*

"*This measure would permit a new tax base to be voted, after which the six percent limitation would apply.* More economy might result if a realistic tax base were established, thereby making the voters less inclined to vote sums outside the six percent limitation.
\* \* \* \* \*

"This amendment is an effort to make the six percent limitation work more effectively by bringing levies up to amounts now needed—if the voters desire it." (Italics added.)

No one, I suggest, can read the full text of these statements in the Voters' Pamphlet—one prepared by an official committee of the legislature, the other by a committee appointed by the Governor pursuant to statute and constituting a "public document", and both intended to enlighten the electorate as to the meaning of the measure they were to vote upon—without being impressed by the emphasis which the authors deemed it necessary to place upon the continued preservation of the six percent limitation as a brake on public spending which might inordinately increase taxes on property. That was the original purpose of the limitation. It was "to give assurance that an amount shown by actual experience during the preceding triennium to have been sufficient plus six per centum thereof could be made available to the public without the necessity of a referendum thereon." *School Dist. No. 1, Mult. Co. v. Bingham,* 174 Or 540, 547, 149 P2d 963. Now, it was not necessary to make any representations to the people that the limitation would continue to apply in the absence of the adoption of a new tax base. That was written large for all to see. The doubt that might arise in the voter's mind could only be as to whether it would control levies made after the adoption of a new tax base. And so it was that one of the committees stated that "If the new tax base is accepted by the voters, it automatically becomes subject to the 6% limitation" and published in bold face type the statement "THIS AMENDMENT DOES NOT DO AWAY WITH THE 6% LIMITATION"; and the other committee stated that the amendment proposed was "to preserve and again make workable and effective the six percent limitation" and that "This measure would

permit a new tax base to be voted, after which the six percent limitation would apply."

If we are to pay any attention at all to this interpretation of the measure, the position of the School District cannot be sustained, for under its contention it can make as many successive levies as it pleases within its new base, in complete disregard of the six percent limitation and of its "actual experience" during the preceding triennium. To approve this contention would be to approve an effective device for evading the Constitution. All that any taxing unit need do hereafter for the accomplishment of that end is to vote a new tax base, in however large an amount and however unrelated to its present necessities, and thereafter keep its levies within that amount.

I have deferred until now consideration of Subdiv. 2 of Art. XI, § 11, which provides in part that "the new tax base, if adopted, shall first apply to the levy for the fiscal year next following its adoption." In this case that would be the fiscal year 1954-55. The Attorney General contends that the word "apply", as thus used, means that the full amount of the new tax base must be levied for the fiscal year next following its adoption. I am inclined to think that it was the expectation of those who drew the measure that this course would be followed by taxing units. It is not reasonable to suppose that it was contemplated that the new tax base would bear no relation to the actual needs of the taxing unit at the time of its adoption— that it would, for example, establish a base known to be one and a half million dollars in excess of the budget for the fiscal year following its adoption, as the School District did in this case. The requirement of Subdiv. 2 that the measure shall specify "in dollars and cents" the amount of the base sought to be established would seem to indicate that it must be in an

amount needed in the year in which the tax base shall "first apply", for taxing units do not ordinarily make up their budgets a year in advance. But the language of Art. XI, § 11, is in the negative. It prohibits the levying of a tax in excess of the new tax base, and, thereby, it would seem to me, would impliedly authorize a levy in a lesser amount. It could well occur that the amount of a new tax base adopted at a general election in November would, owing to some unforseen change in conditions during the eight months elapsing before the beginning of the next fiscal year, turn out to be in excess of the anticipated requirements of the taxing unit. In that case a levy in the full amount of the new tax base would scarcely seem to be a reasonable exercise of the taxing power. Regardless, however, of this question, the application of the six percent limitation to the levy remains unaltered. Whether it be in the full amount of the new tax base or in a lesser amount, the levy immediately becomes subject to the limitation. For, as counsel for the School District well says, "regardless of the source of authority for the levy, it is nevertheless an amount of tax lawfully levied * * * in any one of the three years immediately preceding." Holding to these views, I would, of course, agree that if the School District could constitutionally levy the full amount of its new tax base now, it would have the power in the year following to levy that amount plus six percent.

Much has been said in argument about whether a tax base is a "floor" or a "ceiling", but little is to be gained by indulging in a battle of semantics. The Constitution itself twice defines the phrase in language that is simple and easily understood. It means one thing under one definition and something different under the other. Under either definition it is an amount beyond which a taxing unit is not permitted to go in

raising revenue. The only question is whether the first limitation has any impact upon the second. Both parties to the litigation agree that there is an inter-relationship. They disagree only as to how and when the six percent limitation operates upon a new tax base adopted by the people. The School District claims the right to use the six percent limitation as a kind of benefaction, although it is obviously and historically intended as a curb on spending. The Attorney General asserts that under the 1952 amendment it was to continue to operate as such a curb, notwithstanding the adoption of a new tax base. To my way of thinking, having in mind the history of the six percent limitation and the place which it holds in the regard of the people of Oregon, the construction of the measure in the Voters' Pamphlet settles the question. To quote Mr. Justice Holmes' phrase, used by him in quite another connection, the School District's new tax base is not a "brooding omnipresence in the sky", forever protecting it from the menace of the six percent limitation. On the contrary, the Constitution authorizes the adoption of such a base only for the purpose of enabling a taxing unit to get a new start on a higher plane from which the six percent limitation once again begins to operate. Boards of directors of school districts and governing bodies of other subdivisions of the state which exercise the power of taxation are still required, once a levy has been made pursuant to a new tax base adopted by the electorate, to measure their subsequent levies by the experience of prior years.

In my opinion, the only lawful levy which the School District may make for the fiscal year commencing July 1, 1955, is an amount not to exceed $11,190,000, the amount of last year's levy, plus six percent. I would overrule our former opinion and reverse the decree of the Circuit Court.