Argued and submitted November 20, 1981, resubmitted In Banc November 3, affirmed December 15, 1982, reconsideration denied February 9, petition for review allowed March 8 (294 Or 569)
See 295 Or 505, 668 P2d 354 (1983)

STATE OF OREGON,
*Respondent,*

*v.*

GARY D. GORTMAKER,
*Appellant.*

(No. 119905, CA 19226)
(No. 119906, CA 19227)
(No. 119907, CA 19228)
(cases consolidated)

655 P2d 575

John R. Faust, Jr., Portland, argued the cause for appellant. With him on the brief was Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

William F. Gary, Solicitor General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Deputy Solicitor General, and Thomas H. Denney, Assistant Attorney General, Salem.

WARDEN, J.

Joseph, C. J., dissenting.

_____

## WARDEN, J.

Defendant appeals his convictions for theft in the first degree, ORS 164.055; tampering with public records, ORS 162.305; unsworn falsification, ORS 162.085; and official misconduct, ORS 162.415.[1] He contends that the trial court erred in failing to quash the indictment on the ground that the grand jury was selected in violation of Article VII (Amended), Section 5(2) of the Oregon Constitution and in denying his motions for judgment of acquittal on each of the crimes charged.

Defendant was the Marion County District Attorney from 1965 until the time of the trial. On May 27, 1980, a special grand jury was empaneled in the county to investigate allegations of criminal conduct by defendant; it subsequently returned the indictments on which he was tried. The principle issue on appeal concerns the method of selecting the special grand jury,[2] which was as follows: In January, 1980, the Marion County Court Administrator summoned 250 persons to serve on the jury panel for both the district and circuit courts for Marion County. Of the 250 persons summoned, between 70 and 95 actually reported. Some did not respond to their summons, and others were excused from duty, either by a circuit or district judge or by court administrative staff without consulting with a judge.

The regular term of jury duty in Marion County is two months, but the term of this jury panel, which was selected in January, was extended through June by order of the court, because of the county's financial difficulties. During this extended term, some of the original 70 to 95 jurors were excused entirely after having served for more than four weeks. *See* ORS 10.050(3), n 4, *infra.* Others were temporarily excused, either by a judge or a member of the court staff, for reasons of personal convenience, such as vacation plans. In addition, staff members were apparently unable to contact some of the original jurors to inform

---

[1] Defendant was convicted of three counts of theft in the first degree, two counts of tampering with public records and two counts of unsworn falsification.

[2] Because this issue is complex and our discussion lengthy, for clarity we will defer presentation of the facts related to defendant's other assignments until we discuss them.

them that their term had been extended,[3] and therefore they were excused.

On May 21, 1980, the court administrator drew by lot the names of ten jurors for the special grand jury that was to investigate defendant from all the jurors then remaining for jury duty and not known to be unavailable for duty commencing May 27. Of these ten jurors, five either could not be reached by the court staff or indicated to the staff that they would be unavailable for duty on May 27. The court administrator accepted the statements of the prospective jurors who indicated that they would be unavailable, without conferring with a judge as to whether they should be excused from service.

On May 22, the court administrator drew the names of four more jurors from all the remaining jurors not known to be unavailable. On May 27, some of the jurors selected on May 21 and 22 did not report for duty. In order to complete the special grand jury, a court secretary selected 17 jurors for a sub-pool, from which two additional jurors were drawn by lot. The 17 were chosen, according to the secretary, because they had regularly attended during the three months that they had already served.

## ARTICLE VII, (AMENDED) SECTION 5(2)

In his first assignment, defendant contends that the trial court erred in denying his motion to quash the indictments, because the grand jury was not selected by lot from among all the jurors in attendance as required by Article VII (Amended), Section 5(2) of the Oregon Constitution, which provides:

"A grand jury shall consist of seven jurors chosen by lot from the whole number of jurors in attendance at the court, five of whom must concur to find an indictment."[4]

---

[3] This is apparently what took place; the court administrator's testimony is not entirely clear on this point and on one or two others.

[4] ORS 132.020(1) sets out the method by which grand jurors shall be selected:

"(1) Under the direction of the court, the clerk shall write upon a separate ballot the name of each juror in attendance upon the court, place the ballots in the trial jury box and draw ballots therefrom one by one until the names of seven of such jurors are drawn and accepted by the court. The seven persons thus chosen shall constitute the grand jury."

In response, the state argues (1) that defendant's motion is barred by ORS 135.510; (2) that Article VII, Section 5(2) does not create a substantive right for individual defendants but rather is only the authority for prosecutors to proceed by grand jury indictment; (3) that technical noncompliance with this constitutional provision is inconsequential when, as here, the defendant cannot show prejudice from the grand jury's selection; and (4) even if the trial court erred, the error is harmless in light of defendant's subsequent conviction.

I

Although the threshhold question is whether ORS 135.510 bars the challenge to the indictment, its resolution is interwoven with the underlying nature of Article VII, Section 5(2), *i.e.*, whether that provision creates an individual right, and both questions bear on the same underlying issue: whether an indictment which is returned by a grand jury selected in contravention of Article VII, Section 5(2) is subject to a motion to quash. Because the same precedent and policy considerations determine both questions, we will dicuss them together.

---

ORS 132.030 permits the "court" to discharge a person from jury duty for the reasons prescribed in ORS 10.050. That statute provides:

"(1) The *court* shall excuse a person from acting as a juror upon a showing of undue hardship or extreme inconvenience to the person, the person's family, the person's employer or the public served by the person. In applying this subsection the court shall carefully consider and weigh both the public need for juries which are representative of the full community and the individual circumstances offered as a justification for excuse from jury service. A person may request and be granted excuse from jury service under this subsection by means of telephone communication or mail.

"(2) Notwithstanding ORS 10.030(2), a judge may, on his own motion, excuse a juror whose presence on the jury would substantially impair the progress of the action on trial or prejudice the parties thereto.

"(3) A person shall not be required to serve as a petit juror at any one term of the court for more than four weeks, and shall, upon application, be entitled to be discharged from further attendance upon the court as a juror at such term, after having served for a reasonable period of time, as determined by the court, not to exceed four weeks. (Emphasis supplied.)

Defendant also contends that ORS 132.030 and 10.050(1) were not followed, but it is unnecessary to discuss that issue.

■ The constitution has contained a provision comparable to Article VII, Section 5(2) since 1859.[5] ORS 135.510 provides:

"(1) The indictment shall be set aside by the court upon the motion of the defendant in either of the following cases:

"(a) When it is not found, indorsed and presented as prescribed in ORS 132.360, 132.400 to 132.430 and 132.580.

"(b) When the names of the witnesses examined before the grand jury are not inserted at the foot of the indictment or indorsed thereon."

A statutory provision comparable to ORS 135.510 has existed since 1864.[6] Defendant's ground for challenging the indictment does not come within this statute. For that reason, and in reliance on *State v. Bock*, 49 Or 25, 88 P 318 (1907), the trial court ruled that ORS 135.510 barred defendant's motion, without considering the merits of the challenge. Defendant argues that ORS 135.510 does not apply to constitutional challenges to an indictment. We agree.

In *State v. Lawrence*, 12 Or 297, 7 P 116 (1885), the defendant contended that the grand jury that indicted him was formed in violation of original Article VII, Section 18. *See* n 5, *supra*. The grand jury had been formed pursuant to a statute which provided that the jurors be selected several days prior to the term of court. The statutory predecessor to ORS 135.510, *see* n 6, *supra*, did not authorize a defendant to challenge an indictment on that ground. *See State v. Whitney*, 7 Or 386,

---

[5] Original Article VII, Section 18 of the Constitution provided, in relevant part:

"The legislative assembly shall so provide that the most competent of the permanent citizens of the county shall be chosen for jurors; and out of the whole number in attendance at the court seven shall be chosen by lot as grand jurors, five of whom must concur to find an indictment."

[6] General Laws of Oregon, ch 10, § 115, p 460 (Deady 1845-1864) provided:

"The indictment must be set aside by the court, upon the motion of the defendant, in either of the following cases:

"1. When it is not found, endorsed and presented as prescribed in chapter VII of this code;

"2. When the names of the witnesses, examined before the grand jury, are not inserted at the foot of the indictment or endorsed thereon."

388 (1879). The court nevertheless struck down the statute under which the grand jury was selected, because it violated Article VII, Section 18 and further held that the defendant was entitled to have the indictment quashed and his conviction reversed. The court stated:

"With us, so long as the grand-jury system is permitted to remain — not abolished — *it is the constitutional right of a defendant accused of a crime to demand that the indictment shall be found by a grand jury selected only as provided in the Constitution.*" 12 Or at 300. (Emphasis supplied.)

*Lawrence* was limited somewhat by *State v. Witt,* 33 Or 594, 55 P 1053 (1899). In that case, the defendant moved to vacate the judgment, after he had been sentenced, because the pool from which one member of his grand jury had been chosen did not include 12 jurors who had already been empaneled for a case being tried at the same time. The court upheld the conviction, distinguishing *Lawrence* as follows:

"*First,* the grand jury which indicated Lawrence was chosen and organized under an unconstitutional and void law; and, *second,* the objection to the validity of the grand jury was made before plea." 33 Or at 596-97.

In *State v. Bock, supra,* the defendant moved to quash the indictment before his plea, because a grand juror had been discharged from duty for a reason not authorized by statute. Without mentioning *Lawrence,* the court ruled that the predecessor to ORS 135.510 did not authorize a motion to set aside an indictment on that ground, quoting from *State v. Whitney, supra,* a statement that that statute set out the only grounds to challenge an indictment.

■ ■ Taken together, these cases indicate that an indictment is subject to a motion to quash on the ground that the grand jury which returned it was not selected in the manner required by Article VII, Section 5(2).[7] Such an

---

[7] Although in *Lawrence* the motion to quash challenged the *statute* under which the grand jury was convened, that distinction is unimportant because the motion was still an attack on the indictment, and the predecessor to ORS 135.510 did not authorize a challenge on this ground either. There is language in *Witt* that suggests that the distinction between an unconstitutional statute and the failure

interpretation continues to make sense. Whether this constitutional provision is characterized as a personal right or a prosecutor's power,[8] the principal purpose of the language at issue — "by lot from the whole number of jurors in attendance at the court" — can only be to guarantee that a biased grand jury will not require an innocent person to stand trial on evidence that would not have persuaded an unbiased jury; it does this by insuring that the grand jury be impartial and representative.[9] *See Smith v. Texas,* 311 US 128, 130, 61 S Ct 164, 85 L Ed 84 (1940); *Grand Jury of Seminole Cty. v. Dye,* 571 P2d 1200, 1206-07 (Okla 1977). The societal interest in insuring that an innocent person not stand trial and the grand jury's role in safeguarding that interest are deeply rooted in our law. Recognition that standing trial, with its attendant risks, fears, expense, and inconvenience, is a substantial burden on an accused underlies, in part, the federal Fifth Amendment prohibition of double jeopardy. As long ago as 1815, the grand jury was characterized by Justice Story, then sitting as a circuit judge, as "the great inquest between the government and the citizen." *United States v. Coolidge,* 25 F Cas 622, 623 (D Mass 1815).

Moreover, it becomes even clearer that Article VII, Section 5(2) is designed to safeguard that individual interest when it is viewed in the context of subsections 5(3), (4) and (5). Those subsections provide that a person can be charged in circuit court with a felony *only* on a grand jury

---

of an administrator to follow the constitution "strictly and accurately" may be significant, but we think that that distinction bears on whether there has been substantial compliance with the constitutional mandate, discussed further below. It would be anomalous, for example, if a defendant could not challenge an indictment returned by a grand jury organized under a valid law but which a prosecutor had wholly disregarded by hand-picking the seven grand jurors, while a defendant could challenge the indictment where the grand jury was selected in accordance with a statute that insured impartiality but which did not comply with Article VII, Section 5(2) for purely technical reasons — which was the case in *Lawrence.*

[8] This constitutional provision may also be designed to insure that a guilty person cannot escape punishment because of a favorably biased grand jury. *See Hammers v. State,* 332 P2d 1097 (Okla Crim App 1959).

[9] A random selection procedure does not "insure" impartial jurors, of course, because a biased juror can be drawn by lot as well. That possibility does not reduce the importance of selection by lot as a major safeguard against an erroneous indictment, however — especially since it takes five grand jurors to find an indictment.

indictment or an information and that an information can serve as the charging instrument *only* after probable cause that the person named committed a felony is established in a preliminary hearing before a magistrate — unless the person *knowingly waives* indictment or preliminary hearing. That a prosecutor's alternative method for bringing an accused to trial also provides for an evaluation of the evidence against him by a neutral decision-maker, which can be avoided only with an accused's consent, amply demonstrates that *personal protection* against an unnecessary trial is a major purpose of this provision. Moreover, even if Section 5(2) were designed to create powers in the prosecutor, as the state argues, the language at issue is clearly a limitation on that power; it is hardly necessary to specifically *empower* prosecutors to select grand jurors through random, as opposed to non-random, methods.

If the individual protection — or limitation on the state — provided by Article VII, Section 5(2) is to have real meaning, *i.e.,* be enforceable, then an accused must be able to avoid trial on an indictment found by a grand jury selected in violation of the provision. *Lawrence* permitted a defendant to quash an indictment returned by a grand jury constituted in violation of this provision and thereby implicitly construed the predecessor to ORS 135.510 as not barring a motion to quash. *Accord State v. McReynolds,* 212 Or 325, 319 P2d 904 (1957) (also reached merits of Article VII (Amended), Section 5(2)) challenge to indictment with no mention of ORS 135.510); *State v. Clark,* 291 Or 231, 630 P2d 810 (1981) (reached merits of Article I, Section 20 challenge to indictment with no mention of ORS 135.510). Defendant was entitled to challenge the indictment by a motion to quash.

## II

The next question is whether the method used in selecting this grand jury violated Article VII (Amended), Section 5(2). In essence the alleged violations are that (1) jurors were eliminated from the panel because the court staff could not contact them or because staff members excused them without a judge's approval as required by ORS 10.050(1), *see* n 4, *supra;* (2) after the special grand jury was selected, individual jurors were excused because

they could not be reached or because they indicated to court staff members that they would be unavailable; and (3) the court secretary hand-picked 17 jurors for a sub-pool of jurors from which two were chosen by lot for the special grand jury.

■ Clearly, there was not strict compliance with Article VII, Section 5(2). Oregon constitutional provisions are to be interpreted in light of their purposes, however, rather than on narrow technical grounds. *School Dist. 1 Mult. Co. v. Bingham,* 204 Or 601, 611, 283 P2d 670, 284 P2d 779 (1955). Other courts have held "substantial compliance" with statutes designed to insure impartial grand juries to be sufficient to uphold indictments. *People v. Mack,* 367 Ill 481, 11 NE2d 965 (1937); *Rudd v. State,* 231 Ind 105, 107 NE2d 168 (1952). Unfortunately, *Lawrence* and *Witt* do not provide a great deal of guidance on this issue — nor do the parties.

The state contends that Article VII, Section 5(2) should be given its most restrictive interpretation. It contends that a defendant must prove prejudice, *i.e.,* that jurors were selected for bias against him, before an indictment may be quashed and that, because defendant concedes that he cannot "prove" actual bias here, that is the end of our inquiry.

■ There are several problems with requiring an accused to *prove* actual bias before the trial court can quash the indictment. First, it overlooks the importance of this provision in putting the selection process beyond suspicion, *see Hammers v. State,* 337 P2d 1097, 1104 (Okla Crim App 1959); *State v. Bass,* 210 Ind 181, 1 NE2d 927, 928, (1936), or the probability of unfairness. As the United States Supreme Court observed, in a similar context:

> "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In Re Murchison,* 349 US 133, 136, 75 S Ct 623, 99 L Ed 942 (1955).

The "probability of unfairness" cannot be prevented if a defendant must prove matters peculiarly within the knowledge of others, *i.e.,* whether a court administrator departed

from constitutional requirements in order to select prejudiced grand jurors. Any exercise of discretion in the selection of jurors provides those making the selection with the opportunity to slant the jury.

Second, it is unclear how a defendant can show bias, if it does occur. Under the state's argument, even if a court staff member hand-picked all seven grand jurors, the defendant would still need to prove actual bias, a difficult task unless the administrator were to admit to an improper purpose. Whether a defendant would be permitted to examine the grand jurors themselves as to their attitude toward him or toward defendants generally or as to their prior grand jury service and whether it shows them to be prejudiced is highly unlikely. *See* ORS 132.210; *State ex rel Johnson v. Roth,* 276 Or 883, 886, 557 P2d 230 (1976). The limitations on opportunities to examine grand jurors, as contrasted with the considerable opportunity to examine and excuse trial jurors, only underscores the importance of an impartial method of selection. In any event, it would ill serve the administration of justice to put the grand jury on trial, in effect, prior to trying the defendant. Because, if there was prejudice, it is within the knowledge of the state's agents, but extremely difficult for a defendant to prove, and because it was, after all, the *state* which failed to comply with the constitutional safeguard, it would be wholly inappropriate to require the defendant to prove practical injury. *See United States v. Roemig,* 52 F Supp 857, 862 (ND Iowa 1943).

Defendant takes a contrasting but also broad view of Article VII, Section 5(2), arguing that any reduction of the original grand jury pool, except in strict accordance with statutory methods for exclusion of jurors, vitiates an indictment. This view was implicitly rejected in *State v. Witt, supra,* where the court stated:

> "There is a distinction to be noted in the books between the acts of a body assuming to be a grand jury, but wholly unauthorized, or chosen by an illegal and unwarranted method, and one organized under a valid law, though its provisons are not *strictly and accurately* followed. * * * The statute * * * under which the grand jury that indicted the defendant was formed and organized is admitted to be valid, and in conformity with the requirements of the

constitution, and the *only objection made is that the court did not strictly follow its terms and provisions.* This did not render the grand jury an illegal body, or its proceedings void, and the objection to the regularity of its organization, if open to the defendant at all, should have been taken advantage of before plea." 33 Or at 596 (Emphasis supplied.)

Although the *Witt* court did not flatly state that an indictment would be upheld despite minor departures from the requirements of Article VII, Section 5(2), if there was a timely objection, we think that to so hold would be consistent with the general rule that constitutional provisions are to be interpreted in light of their purposes.[10] Here, it appears that the largest reduction in the original pool occurred because jurors could not be reached or did not respond to their summons. Although that is regrettable and may affect whether the grand jury represents a cross section of the community, it is unlikely to affect whether the grand jury is impartial. *See Porter v. State,* 391 NE2d 801, 816 (Ind 1979). Moreover, there is force to the state's argument that requiring literal compliance would render the grand jury system virtually unworkable.

■ The starting point, we think, is that "substantial compliance" must be measured against the *realistic risk* of bias. *United States v. Bearden,* 659 F2d 590, 603 (5th Cir 1981), *cert den* 456 US 936 (1982); *Hammers v. State, supra,* 337 P2d at 1105. There is no risk when a juror is eliminated from the pool through a random act or procedure, *see* n 10, *supra,* and the risk is greatest of course when a juror, or jurors, are hand-picked by a court functionary; the distinguishing feature is whether *any* discretion is exercised in the selection process. Between these two extremes, however, the distinctions are of degree rather than principle. Nevertheless, when the focus is on the realistic risk of bias, further analysis is possible.

■ The salient feature of ORS 10.050(1), *see* n 4, *supra,* for example, is that the elimination of a juror from

---

[10] It would be absurd, for example, to invalidate all indictments returned by a grand jury, because, in placing the 250 names in the jury box from which the 7 grand jurors were selected, one name accidently fell to the floor and was excluded.

the pool is juror-initiated, *i.e.,* the juror seeks to be excused for personal, health or business reasons. This self-selection process may affect the representative character of the jury, but it protects fairly well against any realistic risk of bias — at least where, as here, the panel remains large and there is no indication that these requests are being granted or denied differentially. The legislature vested the authority to excuse jurors under this provision in a judge, and we do not condone the practice of court staff members ruling on these requests, as was done here, nor do we express an opinion on what steps we would take to enforce that statutory requirement. Nevertheless, unless excusing jurors for the reasons set out in ORS 10.050(1) contravenes Article VII, Section 5(2), and defendant does not suggest that it does,[11] we see no constitutional significance in the fact that staff members, rather than judges, were ruling on these requests. When jurors are excluded, because they may impair the trial or prejudice the parties or because they have served their statutory time, ORS 10.050(2) and (3), there is also no realistic risk of bias.

More problematic, however, is the exclusion of specific jurors from the panel when the panel is very small, and especially the elimination of specific jurors from the grand jury once it has been chosen. Here ten persons were drawn for the special grand jury, but five were eliminated on the sole authority of the court administrator. Her explanation was that the five either could not be reached or stated that they would be unavailable. This raises a realistic opportunity to slant the jury, absent full involvement of the judge to insure that an equal and thorough effort is made to contact all jurors whose names are drawn and to insure that jurors are not improperly excused from service. Recognition of this risk may be implicit in ORS 132.020(1), *see* n 4, *supra,* which provides that "the seven persons thus chosen *shall* constitute the grand jury." (Emphasis supplied.) Moreover, the risk and appearance of prejudice are palpable when as here, the administrator hand-picks jurors for a sub-pool from which the actual jurors are drawn.

---

[11] In light of the authority over the selection and qualification of jurors conferred upon the legislature by Article VII (Amended), Section 5(1), it may be that the correct interpretation of "then in attendance at the court" is all jurors not excused pursuant to statutory methods which preserve impartiality.

■ In principle, an administrator's exercising discretion in selecting a small group of jurors and then drawing by lot from it is not significantly better than selecting the individual jurors. The impropriety of doing so is especially clear in a case such as this one. This was a special grand jury called to hear evidence against a public figure in a case that had received considerable publicity. Defendant was presumably known to those who selected and excused the jurors. Members of the court staff admitted to familiarity with the jurors, who had been coming to the courthouse for over four months, and the jurors admitted that discussion of this case prior to empanelment of the grand jury was "pervasive" in the courthouse. The method of selecting this grand jury violated Article VII, Section 5(2), and the trial court erred in failing to quash the indictment.

## III

The most difficult question remains: Whether defendant's conviction by a properly constituted trial jury should be reversed and the indictment quashed, at this point, because the grand jury was improperly selected? Neither *Lawrence* nor *Witt* provide a clear answer to this question. The precise rationale for reversing the conviction in *Lawrence,* as further explained in *Witt,* was that the grand jury was a nullity because it was chosen under a void law, and, therefore, the accusatory paper upon which the defendant was tried was not an indictment. *Witt* expressly left open the question whether *de facto* violations of Article VII, Section 5(2) require reversing a subsequent conviction, and we think that the somewhat mechanical reasoning of *Lawrence* does not provide an adequate analysis for that question, whatever its merit at the time. Moreover, the Supreme Court in more recent cases has taken a "pragmatic approach" in deciding whether to reverse reliable criminal convictions because of constitutional violations which do not bear on the defendant's guilt or innocence. *State v. Newton,* 291 Or 788, 812, 636 P2d 393 (1981); *State v. Nettles,* 287 Or 131, 139, 597 P2d 1243 (1979). We take that approach here.

Justice Jackson identified the critical considerations in his dissent in *Cassell v. State of Texas,* 339 US 282, 70 S Ct 629, 94 L Ed 839 (1950), in which the Supreme Court reversed the defendant's conviction and quashed the

indictment because blacks had been excluded from the grand jury in violation of the Fourteenth Amendment, even though there had been no discrimination in the selection of the trial jury. Justice Jackson stated:

> "No question is here as to [defendant's] guilt. We are asked to order his release from this conviction upon the sole ground that Negroes were purposefully discriminated against in selection of the grand jury that indicted him. * * *
>
> "In setting aside this conviction, the Court is moved by a desire to enforce equality in that realm where, above all, it must be enforced — in our judicial system. But this conviction is reversed for errors that have nothing to do with the defendant's guilt or innocence, or with a fair trial of that issue. This conflicts with another principle important to our law, *viz.* that no conviction should be set aside for errors not affecting substantial rights of the accused." 339 US at 298-99.

After pointing out that the Fourteenth Amendment requirement that blacks be afforded the same opportunity to serve on grand juries as white citizens conferred a substantive right upon the prospective black grand jurors rather than on the defendant — a distinction not relevant here — he went on to say:

> "Two reasons occur to me which could justify this Court in translating the wrong to those Negroes excluded from a grand jury into a right of this defendant to void an indictment. One is that the absence of Negroes on the grand jury prejudiced this defendant. The other is that it is the only practicable method for enforcing the right of qualified Negroes to serve on grand juries." 339 US at 300.

 Regarding enforcement, it is not surprising, considering the well-documented resistance to this constitutional mandate by many government entities, that his argument that existing statutory remedies for blacks improperly excluded from jury service were adequate to enforce the Fourteenth Amendment was implicitly rejected by the majority in *Cassell* and expressly rejected in *Rose v. Mitchell,* 443 US 545, 558-59, 99 S Ct 2993, 61 L Ed 2d 739 (1979).[12] Similarly, demonstrated and continuing viola-

---

[12] In *Rose,* Justice Stewart expressly embraced Justice Jackson's rationale in a concurring opinion, joined by Justice Rehnquist. 443 US at 574. Justice Powell

tions of the Fourth and Fifth Amendments underlie the need to reverse reliable convictions based on tainted evidence in order to deter future unconstitutional conduct. *See United States v. Calandra,* 414 US 338, 347-50, 94 S Ct 613, 38 L Ed 2d 561 (1974).

In the present case, however, we do not believe that it is necessary to reverse defendant's conviction in order to enforce the guarantee of Article VII, Section 5(2). Here, there is no indication that violation of this constitutional provision is a continuing problem, and the very fact that this is the first reported case since 1899 to raise the issue suggests the absence of a pattern of abuse. Moreover, this case differs from most Fourth and Fifth Amendment cases in another important respect: a trial court can adequately prevent the underlying harm that Article VII, Section 5(2) seeks to avoid. That is, in cases involving Fourth or Fifth Amendment violations, even though a trial court may correctly exclude tainted evidence from trial, the harm to the defendant has already occurred; in cases such as this, however, a trial court stands between the unconstitutional action (improperly constituted grand jury) and the harm to be prevented (an innocent person forced to stand trial).[13] It is therefore significant that the precise error of the trial court was in misinterpreting *State v. Bock, supra,* as preventing it from even considering the merits of defendant's motion. Whatever uncertainty we may have as to the future conduct of court administrators, we are confident that Oregon trial courts, correctly apprised of the law, will exercise diligently their responsibility to quash indictments

also expressed support for the rationale in his concurrence. 443 US at 579. Justice Stevens, in his dissent, intimated that he would have accepted the argument if it were before the court as an original issue, but he deferred to the doctrine of *stare decisis.* 443 US at 593. Justice Clark had said the same thing in *Cassell.* 339 US at 296.

[13] A more precise parallel may be to cases where evidence has been seized pursuant to a search warrant in that a judge had had the opportunity to prevent the underlying harm. Even in those cases, however, the Supreme Court has held that reviewing courts are to accept less persuasive evidence in determining whether there had been probable cause than if reviewing a warrantless search, *United States v. Ventresca,* 380 US 102, 105-09, 85 S Ct 741, 13 L Ed 2d 684 (1965), thereby implicitly recognizing that the need to deter the errors of magistrates in issuing warrants is less than the need to deter unconstitutional searches by police officers acting unilaterally.

issued in violation of Article VII, Section 5(2).[14] If not, or if there is evidence of bad faith by court functionaries, we can reconsider the question when it arises.

Regarding whether a defendant who has been convicted by a properly selected trial jury has been prejudiced by being indicted by an improperly selected grand jury, Justice Jackson stated:

> "[The grand jury's] power is only to accuse, not to convict. Its indictment does not even create a presumption of guilt; all that it charges must later be proved before the trial jury, and then beyond a reasonable doubt. The grand jury need not be unanimous. It does not hear both sides but only the prosecution's evidence, and does not face the problem of a choice between two adversaries. Its duty is to indict if the prosecution's evidence, unexplained, uncontradicted and unsupplemented, would warrant a conviction. If so, its indictment merely puts the accused to trial. The difference between the function of the trial jury and the function of the grand jury is all the difference between deciding a case and merely deciding that a case should be tried.
>
> "It hardly lies in the mouth of a defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice. * * * *Under such circumstances, it is frivolous to contend that any grand jury, however constituted, could have done its duty in any way other than to indict.*" 339 US at 302-03. (Emphasis supplied.)

In *State v. Guse,* 237 Or 479, 392 P2d 257 (1964), the Supreme Court adopted this line of reasoning in refusing to reverse a conviction on the ground that the indictment was based on insufficient evidence.[15] Justice Goodwin, writing for the court, stated:

> "After a jury trial no useful purpose is served by an investigation of the sufficiency of the evidence taken before the grand jury. If the accused is acquitted the matter is moot. If he is convicted, it is irrelevant." 237 Or at 482.[16]

---

[14] Moreover, the threat that a trial court will quash a defective indictment should usually be sufficient to deter court administrative personnel from violating this constitutional provision.

[15] The underlying interest protected by the requirement that indictments be based on sufficient evidence is identical to that protected by Article VII, Section 5(2) — that the accused will not be forced to stand trial except on the strength of sufficient evidence.

[16] Defendant attacks this reasoning, arguing that the very fact that an

Moreover, not only was defendant not prejudiced, but reversing his conviction and quashing the indictment is not "remedial" in any intelligible sense, given that he would almost certainly be reindicted and retried. *See Rose v. Mitchell, supra,* 443 US at 557-58. It would be anomalous to require defendant to stand trial twice in order to vindicate a constitutional provision which was designed principally to prevent the harassment of an unnecessary trial. Understandably, defendant has not complained at that prospect, but that can only be because he would hope that a new trial jury would evaluate the evidence differently. That is a possibility, of course, but it is not a possibility that the law should recognize where, as here, the constitutional transgression has not affected the fact-finding process at trial. Here, unlike Fourth and Fifth Amendment cases where evidence that was admitted in the first trial is excluded from the second, the *same* evidence that was presented to the first jury would presumably be presented to the second jury — unless evidence or witnesses are no longer available, a possibility which weighs against reversal in any context. To reverse a reliable conviction when the only practical consequence is that 12 trial jurors may evaluate differently the same evidence which had been formerly presented to 12 different, properly selected trial jurors is, as a "remedy," too discrediting to the administration of justice to be seriously considered.

---

indictment was returned is treated by the trial jury, in practical effect, as evidence of guilt. Whatever merit there may be in this argument, neither *Guse, Cassell* nor *Rose* discussed the possibility. That is not surprising for the problem applies to trials under unflawed indictments as well, and to require reversal here it must be said that the evidence was so weak that a properly selected grand jury would not have found it sufficient to warrant a trial, yet that same evidence, supplemented only by the fact that an indictment was returned (and rebutted by defendant's evidence) was enough to persuade a trial jury of defendant's guilt beyond a reasonable doubt. Moreover, the evidence of this defendant's guilt, discussed below, was more than sufficient to warrant an indictment; therefore, he would have faced the problem in any event.

Similarly, in arguing that use of a grand jury results in certain tactical advantages for a prosecutor at trial, *e.g.,* previewing a jury's response to witnesses, defendant again fails to show precisely how that bears on whether the error in the selection of the grand jury requires reversal. It is understandable that defendant left the point vague for it must be said that evidence which would not have persuaded a properly selected grand jury to indict persuaded an unbiased trial jury to convict, because the evidence could be presented in a more convincing fashion after being previewed in the grand jury.

██ ██Just as constitutional provisions are to be interpreted in light of their purposes, *School Dist. 1 Mult. Co. v. Bingham, supra,* we think that they should be vindicated in light of their purposes as well. We see no persuasive reason to overturn defendant's reliable conviction, because the grand jury was improperly selected.

## SUFFICIENCY OF THE EVIDENCE

In his second assignment, defendant contends that the trial court erred in denying his motion for judgment of acquittal on the charge of theft of a firearm.[17] He argues that the revolver that is the subject of the charge does not satisfy the statutory definition of "firearm" and that there was insufficient evidence to show that he acted with the requisite culpable mental state.

In September, 1967, a Marion County Sheriff's Officer seized a. 38 caliber Smith and Wesson revolver during the investigation of an attempted murder; it was later introduced as evidence at a criminal trial. In February, 1968, defendant filed a motion for a court order of confiscation and destruction of a number of weapons, including that revolver. On February 6, 1968, the Marion County Circuit Court ordered that certain weapons, including that revolver, be turned over to defendant for destruction or otherwise disposed of pursuant to law.

At the time of that order, defendant had established a practice of selecting confiscated guns for a collection that he maintained. When his staff received lists and photographs of guns ordered to be destroyed and took note of an unusual weapon, defendant would order that it be rendered inoperable and sealed in a box under glass for

---

[17] ORS 164.055(1) provides, in relevant part:

"(1) A person commits the crime of theft in the first degree if, by other than extortion, he commits theft as defined in ORS 164.015; and

"* * * * *

"(d) The subject of the theft is a firearm or explosive; * * *."

ORS 164.015 provides, in relevant part:

"A person commits theft when, with *intent* to deprive another of property or to appropriate property to himself or to a third person, he:

"(1) Takes, appropriates, obtains or withholds such property from an owner thereof; * * *." (Emphasis supplied.)

display. In accordance with that practice, he retained the revolver for display in his office; it was rendered inoperable by removing its firing mechanism. Defendant testified that he thought that the gun was his property, because he was the district attorney, and if he thought he had earned it, he would take it with him when he left the office.

In the summer of 1978, defendant presented the boxed revolver and two badges as momentos to a former Marion County Deputy District Attorney, who had resigned two years earlier. The presentation was made at a party in the presence of 40 other persons, including judges and deputy district attorneys. In the course of the investigation of the case against defendant, a private gunsmith repaired the gun by replacing the missing parts in three or four minutes at a total cost of $6; thereafter the gun was successfully fired.

■ Defendant's argument that this gun was not a firearm, because it was inoperable when he gave it to his former deputy, is wholly without merit. A firearm is defined as follows:

> " 'Firearm' means a weapon, by whatever name known, which is designed to expel a projectile by the action of black powder or smokeless powder and which is readily capable of use as a weapon." ORS 164.055(2)(b).

Under any interpretation of this statute, *see State v. Hash,* 34 Or App 281, 578 P2d 482 (1978), a gun that could be made operable in three to four minutes at a cost of $6 was "readily capable" of use as a weapon.

■ Regarding defendant's mental state, the question on appeal is only whether the facts, viewed in the light most favorable to the state, allowed a rational jury to infer that defendant possessed the required culpable mental state. *State v. Krummacher,* 269 Or 125, 137-38, 523 P2d 1009 (1974). Defendant was an experienced district attorney and had himself prosecuted a policeman for misappropriation of confiscated guns. It is undisputed that the firearm was the property of Marion County and that the destruction order did not authorize defendant to give the gun to a private individual. A rational jury could infer that defendant intended to appropriate to a third person

property that he knew was not his to give away. The trial court did not err in submitting this charge to the jury.[18]

In his third assignment, defendant contends that the trial court erred in denying his motion for judgment of acquittal on the charges of theft in the first degree (of public funds), ORS 164.055, tampering with public records, ORS 162.305, and unsworn falsification, ORS 162.085.

While defendant was district attorney, he maintained a set of records to account for expenditures of funds in particular investigations, which were known as the district attorney investigation (DAI) files and which contained the only records of expenditures of investigative funds kept by the office. In order to receive investigation funds from the Marion County Fiscal Department, it was necessary to submit to the department a Marion County fund claim form and fund claim explanation form, which set out the amount of the expenses, the file on which the expenses were drawn, the date of the draw and the purpose of the draw. When funds were needed, this procedure was initiated either by defendant or his executive assistant, and the explanation form would be signed by the executive assistant based on information she received from defendant. A fund claim expenditure sheet would be signed by defendant, certifying that he had received the amount of money drawn.

The district attorney's office maintained an expenditure detail sheet which stated the file number, date of expense, the activity and an explanation of the amount involved in a particular fund claim. When defendant made a claim, he would have a member of his staff prepare an expenditure detail sheet on information he supplied, and he would then sign it. Administrative staff members were not authorized to change the designations of expenses in a DAI file. Most of the checks received on district attorney investigation files were made payable to defendant. During the fiscal years 1977-78 and 1978-79, the defendant's office followed this procedure for making claims for investigation expenses and obtaining reimbursement from the county.

---

[18] The sentence on this conviction was one of discharge. ORS 161.715.

The evidence that during those two fiscal years defendant repeatedly misused this procedure in order to claim reimbursement for expenses that he had not actually incurred was quite voluminous, and we will summarize it. For numerous case files, defendant claimed and received payment for substantial meal, lodging, and travel expenses which he claimed to have incurred while conducting field investigations. As to each file, deputy district attorneys, police officers and criminal case analysts with specific responsibilities in the case testified that they were unaware of any field investigation by defendant, that they had had no contact with defendant regarding the case and that they did not receive any reports or information from defendant about the case. To illustrate the point, we will set out a few of the most egregious examples.

In the Forester case, a stabbing occurred on the Center Street "duck crossing" bridge in Salem, less than one mile from the District Attorney's office in the courthouse. As personal investigative expenses for this case, defendant claimed reimbursement of $903.80 for meals, appellate court activity, two nights lodging, four telephone calls and travel of 5,369 miles. Deputy district attorneys involved in the case had no such expenses and were not aware of any involvement of defendant in the case. The police were not aware of defendant's involvement in any field investigation. Defendant made similar claims in the Hargrove case, a homicide near the courthouse. Neither deputy district attorneys nor police involved in that case had any indication that defendant was conducting a field investigation.

In the Rose case, defendant made claims for reimbursement for meals for two days for three persons, 203 miles of travel and lodging. During the time these expenses were claimed to have been incurred, defendant, his criminal case analyst and a state police officer were spending two days fishing at Diamond Lake Resort. Defendant paid the expenses of his companions in return for their help in taking his boat out of the water. Defendant's prior stay at Diamond Lake Resort in August, 1977, coincides with an expense claim in the Hascoll case.

Defendant was an officer in the Oregon Army National Guard. While Thomas Creech was imprisoned in

Idaho, he made a demand for prosecution of charges which were pending in Marion County. Although defendant did not intend to bring Creech to trial, on two occasions he claimed reimbursement in the Creech file for travel to Boise, Idaho. The first claim was made for a date on which defendant was in his Salem office. The second claim was dated June 1 to June 5, 1979, during which time defendant was in Boise on active military duty. Idaho prison officials had no record of any contact by defendant with Creech. The Idaho official who prosecuted Creech had no contact with defendant. Similarly, in the Wampler case, defendant claimed reimbursement of $223 for meals, transportation, and lodging in Washington, D. C. A petition for writ of certiorari had been filed in the United States Supreme Court by the Public Defender's office on behalf of Wampler; but the state was represented in' that case by the Attorney General's office. At the time of those purported expenses, defendant was in Washington on military duty.

The state's documentary evidence was that defendant's claims for meals, travel and lodging in some files overlapped and conflicted with claims in other files and that for fiscal years 1977 through 1979, defendant claimed reimbursement for travel of 123,505 miles, when his cars were driven a maximum of 68,768 miles.

It hardly needs to be said that from this evidence a rational jury could infer that defendant had falsified records and used public funds for personal purposes. His principal contentions on appeal are (1) that he had discretion to draw funds from other than the case file for which they were used in order to preserve confidentiality in their use, such as for payment of informants or drug purchases, and (2) that the state's having lost a substantial number of defendant's files raises the risk that "any one of these missing files could have contained exculpatory information regarding funds alleged to have been misappropriated."

The short — and sufficient — answer to defendant's first argument is that an explanation that implausible[19] in the face of evidence so overwhelming does not

---

[19] Allowing for the need to conceal the identity of informants and even the need to conceal the cases in which informants were used, that does not explain why it was necessary for defendant to draw the funds for himself and split the

require the trial court to take the case from the jury. When the state proves that a public official personally received state funds and clearly spent those funds for purposes other than those which he claimed and he offers no satisfactory evidence that the funds were used for legitimate purposes, he cannot complain when the jury draws the obvious conclusion. Similarly, defendant has offered no explanation as to how the missing files could have been exculpatory, *i.e.,* how missing case files could demonstrate that funds he had received but not used with respect to one case had nevertheless been properly spent. Nor can we imagine how those files could do so, considering that defendant's own explanation that he had claimed expenses on the wrong case in order to conceal where the money had actually been spent rules out the possibility that a missing file would state that the funds had actually been spent there.

■ In his fourth assignment, defendant contends that the trial court erred in denying his motion for judgment of acquittal on the charge of official misconduct, ORS 162.415 (causing employes of his office to perform personal services for him on county time.)

The facts are as follows: In May and June, 1978, while defendant was district attorney, his office employed Dennis Martin as a deputy district attorney and Gary Ogle as a law clerk. About that time, defendant received military orders to go to Washington, D. C., to attend a seminar at the National War College and to prepare a paper in connection with the seminar. Defendant asked his chief deputy to contact Martin or Ogle to assist him in getting the necessary material together. The deputy called Martin into his office and informed him of defendant's assignment and that it would be Martin's job, along with Ogle, to do research necessary to enable defendant to write the war college paper and to participate in the discussion. Ogle was similarly informed by the deputy. Ogle and Martin immediately began working on a ten page assignment sheet and 73 item reading list at the Willamette University, City of Salem and State of Oregon libraries.

claimed expenses among travel, lodging, meals, and phone calls as opposed to openly drawing funds from, say, the Forrester case "for anonymous informants in another unidentified case." The manner in which defendant drew these funds strongly indicates that he was, in fact, attributing them to the purpose which he claimed, *i.e.,* expenses which he had personally incurred.

On June 8, 1978, after they had completed much of their reading, Ogle and Martin met with defendant in his office to discuss how to proceed. At the meeting, which lasted 10 to 15 minutes, defendant informed Ogle and Martin that he wanted them to prepare suggested answers to the various topic questions and to make the points general rather than specific. Ogle prepared a four page summary, which was typed by an office secretary. Martin prepared a two page summary, which was typed by defendant's secretary. Martin estimated that he spent 42 to 54 hours of county time working on the project; Ogle estimated that he spent 80 hours on the project. It is undisputed that the work of Ogle and Martin on defendant's military paper was unrelated to the proper functioning of the Marion County District Attorney's office. Defendant testified that he thought that Ogle and Martin were going to do the project on their own time. Ogle testified that it was not true that defendant asked him to look up sources for the paper on his own time.

On appeal, defendant contends that he was acting in an unofficial capacity in asking fellow workers for assistance and that there was no evidence that he knew that his request for assistance amounted to an official action on his part as district attorney. That argument is not persuasive. The trial court did not err in denying the motion for judgment of acquittal on the charge of official misconduct.

Affirmed.

**JOSEPH, C. J.,** dissenting.

The sum and substance of the majority opinion is that defendant is entitled to challenge the indictments, that the grand jury was unlawfully empaneled and that the indictments were unlawful — but that those conclusions have no consequences, because defendant was convicted in a fair trial. If the ultimate conclusion is correct, only the first of the other three conclusions is of any significance — and that significance is not particularly great, certainly not for this defendant and probably not for any defendant. It is predictable that a challenge of the sort made here, given the majority's approach, will usually be unsuccessful, because the ultimate verdict will resolve it. If the defendant

is acquitted, all well and good; if the defendant is convicted in a trial that is free of reversible error, all also well and good. In short, I accept the first three conclusions,[1] and I dissent from the last.[2]

The trial court never reached the merits of the constitutional issue. It held that defendant could not raise the issue because it is not one covered by ORS 135.510.[3] The majority properly concludes that the court was wrong on the only issue that it decided, but the majority then proceeds to say how the question the trial court ought to have reached ought to have been decided. We do not ordinarily do that, and when we do it is usually because the answer is absolutely clear and there is, therefore, an opportunity for economizing on judicial resources. In this instance we ought not to decide the issue unless we are prepared to say that, if the trial court had reached the merits and if it had decided to quash the indictments, it

---

[1] I would have far less difficulty than the majority in reaching the first three conclusions. If ORS 135.510 were interpreted to limit a defendant's right to challenge the *constitutionality* of the process used to select a grand jury, then it is pretty clearly unconstitutional. If a challenger moves *prior to trial* to test the constitutionality of the process used to select a grand jury and makes a *prima facie* showing of a constitutional violation, then the burden shifts to the state to persuade the court that the violation could not to any reasonable probability have caused the selection of a grand jury that was biased against the defendant. That is the learning I would draw from the few relevant Oregon cases *(State v. Lawrence,* 12 Or 297 (1885); *State v. Witt,* 33 Or 594, 55 P 1053 (1899); *State v. Bock,* 49 Or 25, 88 P 318 (1907)) and from the logic of the situation. That approach would, it seems to me, avoid the necessity of looking for a "bright line" to divide substantial from insubstantial deviations from the constitutional command. I am inclined to think that, in this instance, if the problem were approached as I suggest, the state would be hard put to persuade any trier of fact that the series of violations demonstrated by the evidence could not to any reasonable probability have caused the selection of a grand jury that was biased against the defendant.

I believe the majority somewhat confuses or intermixes three distinct questions: Was the jury empaneled by unconstitutional means? Was the jury selected in a manner that violates the statutes regulating the selection of grand juries? Was the jury empaneled by a process that actually or potentially violated constitutional or statutory rights in relating to the provisions regulating the empaneling of grand juries?

[2] Although I might discuss them a bit differently, I agree on the disposition of the motions for acquittal, were I to reach them in the disposition of this case.

[3] Arguably, of course, a grand jury that was not constitutionally assembled could not carry out the mandates in ORS 132.360, 132.400, 132.430 and 132.580. Nonetheless, it is preferable to be much more direct and to say that the legislature cannot limit a person's right to challenge an unconstitutional administrative act.

would have been wrong. Of course, as the majority acknowledges, had the trial court quashed the indictments, that determination would have been upheld.

Ninety-seven years ago the Oregon Supreme Court said:

> "But it is to be noted that the Constitution of New York does not, as the Constitution of Oregon, require the grand jury to be chosen from the jurors in attendance at the court, but the whole matter of selecting a grand jury [in New York] is left almost entirely to the discretion of the legislature, without limitation or reservation. * * * With us [in Oregon], so long as the grand-jury [sic] system is permitted to remain — not abolished — it is the constitutional right of a defendant accused of a crime to demand that the indictment shall be found by a grand jury selected only as provided in the Constitution. * * *" *State of Oregon v. Lawrence,* 12 Or 297, 300 (1885).

Nothing the Supreme Court has said since that time has changed that rule — and the grand jury remains part of the mechanism for the administration of criminal law in Oregon. While it is not clear exactly what is the breadth of the constitutional command as to the pool of jurors, it is clear both that the pool from which the defendant's grand jury was chosen was not the pool intended by the Constitution and that the legislature could not constitutionally have authorized what was done here. Surely, then, what was done here was not authorized in any way, and we have no power to authorize it — if the constitutional provision represents a "right of a defendant accused of a crime to demand that the indictment shall be found by a grand jury selected only as provided in the Constitution." I think it does — but I also recognize that "accidents do happen." Accidents, in the sense used here, do not cause bias. The trial judge ought to be given the opportunity to decide the question he did not think he had the authority to decide.

I would not reverse the conviction; I would remand the case to the trial judge. If he concludes that there was no reasonable probability that the constitutional violations that took place here could have caused the selection of a grand jury that was biased against the defendant, then he ought to deny the motion to quash; otherwise he ought to quash the indictment and dismiss the charges.